**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 28 2013, 7:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BRYAN LEE CIYOU**
**LORI SCHMELTZER**
Ciyou & Dixon, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE PATERNITY OF ) | |
| P.A.B.: ) | |
| ) | |
| K.B., ) | |
| ) | |
| Appellant - Petitioner, ) | |
| ) | |
| vs. ) | No. 15A04-1210-GU-518 |
| ) | |
| J.L., ) | |
| ) | |
| Appellee-Respondent. ) | |
| ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-0906-GU-26
Cause No. 15C01-0601-JP-15

**June 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

This is a consolidated paternity and guardianship case in which the maternal grandmother (Grandmother) of P.A.B. was appointed guardian of the child upon Mother's incarceration in 2009, when P.A.B. was three years old. Father filed a motion to terminate the guardianship in 2010 and subsequently filed a motion seeking custody of P.A.B. Following several hearings and a thorough custody evaluation, the trial court terminated the guardianship and granted Father custody of P.A.B. in October 2012. On appeal, Grandmother contends the guardianship should not have been terminated and even if it was properly terminated, she should have been awarded custody as a de facto custodian.

We affirm.

The facts favorable to the judgment follow. P.A.B. was born on November 18, 2005. Mother was nineteen at the time and had been in a rocky relationship with Father. Both Mother and Father were involved with drugs, and they lived together as a family for several months after P.A.B.'s birth. The couple's relationship began to deteriorate and Mother took steps to move with her child back to Grandmother's home around April 2006. At that time, a domestic violence incident occurred resulting in Father's conviction and incarceration for seven months.[1] Paternity was established on May 12, 2006, during Father's incarceration. Mother retained custody of P.A.B., and Father was ordered to pay child support.

Shortly thereafter, Mother was incarcerated for operating while intoxicated (OWI) with P.A.B. in the vehicle, and Grandmother was appointed temporary guardian of the child

---

[1]  Before this and during Mother's pregnancy, Father was apparently convicted of another domestic violence charge, as well as a drug-related charge.

on June 27, 2006. In the meantime, Mother sought inpatient treatment and reunited with Father upon his release from prison in the fall of 2006. Despite Grandmother's continued guardianship, Father and Mother moved out with P.A.B. for several months. Mother, however, committed another OWI for which she went through drug court and was incarcerated for about seven months beginning in January 2007. As a requirement of probation following her release, Mother also completed outpatient treatment for her substance abuse problem.

Grandmother took over care of P.A.B. during Mother's incarceration, while Father began dating Leslie McAtee and conceived a child with her.[2] Mother and Father's relationship ceased upon her release in mid-2007, and Father maintained little contact with P.A.B. The guardianship was terminated in November 2007, with Mother regaining custody. In the beginning of 2009, Father obtained an attorney and began seeking parenting time through the court, which he was granted by order on April 1.

On June 8, 2009, Mother was arrested for violating her probation out of drug court by having a dirty drug screen. She was incarcerated for ten months as a result. On June 9, with Mother's consent, Grandmother filed for an emergency guardianship hearing. Father appeared at the hearing on June 11, where temporary custody was awarded to Grandmother and Father was granted parenting time. Father and Leslie were ordered to submit to drug testing immediately following the hearing. Father's visitation was suspended on June 24 as a result of the drug tests indicating both Father and Leslie had consumed illegal controlled

---

[2] Born April 17, 2008.

substances. Shortly thereafter, Father filed a subsequent motion to reestablish visitation.

On September 21, 2009, the court held a hearing regarding the appointment of a permanent guardian. Thereafter, the court appointed Grandmother as P.A.B.'s guardian. Father was granted limited, supervised parenting time "contingent upon [him] passing weekly and/or random drug tests". *Appendix* at 46. The court awarded parenting time to Mother, upon her release, at the discretion and under the supervision of Grandmother and also subject to random drug testing.

Upon her release in the spring of 2010, Mother moved back in with Grandmother and P.A.B. Significant conflict arose among the adults in P.A.B.'s life, including Mother, Grandmother, Father, and Leslie. On April 26, 2010, Father filed a motion for modification of visitation, indicating that since Mother's return, "the circumstances of the visitations" had changed and Mother had substantially interfered with the relationship between Father and child. *Id*. at 49. Father requested full parenting time under the Indiana Parenting Time Guidelines. In response, Grandmother filed a motion to modify alleging that the child was "experiencing stress, anxiety and abuse at [Father's] residence". *Id*. at 53. On June 14, 2010, the court awarded additional parenting time to Father, including supervised overnights. The court ordered that Leslie not be involved in exchanges. Moreover, the court urged the parties to get along, especially in the presence of the child. Thereafter, on August 25, 2010, the court modified parenting time to allow for unsupervised visits. The court also ordered the parties to mediation.

Shortly after the unsuccessful mediation, Father filed a motion to terminate

guardianship on November 22, 2010. Thereafter, Father filed a motion to set hearing, a motion to establish overnight and holiday parenting time, and a motion for custody evaluation. The trial court set the matter for a hearing on Father's motion to terminate guardianship for February 2, 2011. Following the hearing, the court appointed a custody evaluator by agreement of the parties. The custody evaluation was provided to the court in May 2011. Thereafter, another hearing regarding termination of the guardianship commenced on July 5, 2011 but was not completed.[3]

Following several continuances, the termination of guardianship hearing resumed on June 26, 2012 and concluded on August 27, 2012. Father testified that he was now a journeyman roofer, with medical insurance and a good income, and that he had recently purchased a six-bedroom house with his fiancé (Leslie), where they lived with their daughter, Father's nine-year-old daughter from another relationship, and Leslie's six-year-old daughter. Father testified that he had not taken drugs since June 2009. At the June 2012 hearing, he indicated that parenting time had been going very well but that communicating with Grandmother had been particularly difficult.

Grandmother did not dispute the existence of significant conflict between the parties. She testified that Mother was clean and sober now and able to parent. In fact, Grandmother indicated that over the past year she had "pretty much stepped back" and Mother had done most of the parenting.[4] *Transcript* at 59. Further, Grandmother opined that there was no

---

[3] Shortly after this hearing in the guardianship action, Father filed a motion for change of custody in the paternity action. By the end of 2011, the paternity case was consolidated into the guardianship case.
[4] This is directly contrary to Grandmother's representation on appeal that Grandmother remained "the primary caregiver and disciplinarian to [P.A.B.]." *Appellant's Brief* at 11.

longer a need for her role as guardian and that she just "want[s] to be the grandmother." *Id*.

at 69.  Although she agreed to the termination of guardianship, Grandmother expressed a

strong preference that Mother be awarded custody.

At the conclusion of the June 2012 hearing, the court thoroughly reprimanded the

parties regarding their "constant conflict" and failure to put the child first. *Id*. at 209.  The

court addressed the evaluators' comment that "there are three poor choices" for the child.

*Exhibits*, Joint Exhibit 1 at 31.  The court directed each party to read and understand the

custody evaluation before returning to court.

Without recounting the details of the lengthy custody evaluation, we set out some of

the recommendations and conclusions made by the evaluators:

> Your Honor, this is a very[,] very difficult case.  Essentially, there are three
> poor choices for [P.A.B] in the opinion of these Examiners.  We believe that
> [Grandmother] can certainly provide good care for [P.A.B], but we further are
> of the opinion that [Father] can do the same, if he applies himself.  However,
> what makes this case very difficult is the level of animosity that exists
> primarily between [Grandmother] and [Father].  [Mother] and [Father] both
> seem to believe that they will eventually be able to communicate with one
> another in [P.A.B]'s best interest.  However, both seem to feel strongly that
> [Grandmother] makes it very difficult….
>
> Given these dynamics, we would recommend that [Father] have sole custody
> of [P.A.B] and that [Mother] have standard parenting time consistent with the
> Indiana guidelines.  We believe that although the choices in this case are poor,
> [Father] together with Leslie is more likely to provide [P.A.B] with a normal
> lifestyle and also be supportive of his contact with his mother….
>
> We do not believe that [Grandmother] is supportive of [P.A.B]'s contact with
> his father and although [Mother] would like to be supportive of this, she is
> prevented from doing so by her mother.  We believe that [Grandmother] has
> provided a tremendous support and help to [P.A.B] during these difficult
> times; however, she is also clearly unaware of the need for boundaries and she
> projects her negative opinions and attitudes directly onto [P.A.B], thus causing

6

significant internal conflict for him with regard to his parental loyalties. Although [Grandmother] has been a consistent caregiver to this point, it is now time for the parents to assume responsibility….

We do not believe that [Grandmother's] involvement in this case will do anything but fuel the animosity, especially between [P.A.B] and his father as well as [P.A.B] and his mother for that matter, and [Mother] seems to be somewhat under the control of her mother at this time. [P.A.B] is aware of the adult conflict and he displays signs of a confused child with uncertain loyalties…. He clearly needs and deserves a strong and consistent parental presence coupled with a loving and supportive environment; i.e., an environment that is not fraught with ongoing conflict between households. [Father], Leslie and [Mother] appear to have a much better awareness of the importance of sheltering [P.A.B] from the animosity as compared with [Grandmother], in our observation.

*Id*. at 31-32.

At the August 2012 hearing, Father testified that communication between the parties had improved and that he had been allowed to exercise additional parenting time, including overnight parenting time over three weekends.[5] Both Mother and Grandmother indicated that they had seen a positive change in [P.A.B] as a result. At this hearing, Father also expressed concern about Mother's continued drug use and indicated that she had been arrested, since the last hearing, for public intoxication and possession of marijuana. Grandmother described the arrest as an isolated "set-back" and still supported Mother being granted custody. *Transcript* at 303. Similarly, Mother testified that this was a one-time relapse, but a drug test taken immediately after the hearing indicated otherwise. Mother tested positive for benzodiazepines, despite indicating to the probation officer conducting the test that she had

7

not taken any controlled substances. Father's and Leslie's tests, on the other hand, were negative for illegal drugs.

At the conclusion of the August hearing, the court took the matter under advisement and ordered the above discussed drug tests. Thereafter, on October 2, 2012, the court entered its order terminating guardianship and granting motion for change of custody. The court awarded custody to Father and granted Mother parenting time pursuant to the Indiana Parenting Time Guidelines, but ordered the parenting time to be supervised by Grandmother given Mother's recent criminal activity and drug involvement. Grandmother now appeals.[6]

Custody modifications are reviewed on appeal for abuse of discretion with a "preference for granting latitude and deference to our trial judges in family law matters." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). In this case, the trial court entered special findings and conclusions pursuant to Indiana Trial Rule 52(A).

> In reviewing findings made pursuant to Rule 52, we first determine whether the evidence supports the findings and then whether findings support the judgment. On appeal we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. A judgment is also clearly erroneous when the trial court applies the wrong legal standard to properly found facts.

*K.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009) (citations omitted).

---

[5] Again, this is contrary to Grandmother's assertion on appeal that Father had exercised only one overnight parenting time with P.A.B. since June 2009.

[6] Father and Mother have not filed appellate briefs in this case. Accordingly, we may reverse if Grandmother presents a prima facie case of error. *In re Riddle*, 946 N.E.2d 61 (Ind. Ct. App. 2011). Prima facie error is "error at first sight, on first appearance, or on the face of it." *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 876 (Ind. Ct. App. 1991).

We initially address Grandmother's argument that this was a contested termination of guardianship. In this regard, she challenges the following finding made by the trial court: "[Grandmother] has indicated that it is her wish that the guardianship be terminated and that parents take on their role as primary care givers." *Appendix* at 26-27. This finding by the trial court is not clearly erroneous. Grandmother plainly indicated at the final hearings that she was ready to just be a grandmother to P.A.B. and expressed her desire that Mother be granted custody and Father receive parenting time under the Guidelines. The termination of guardianship does not become contested simply because Grandmother does not agree with the court's ultimate custody determination. Moreover, even if we were to agree that Grandmother sought continued custody of P.A.B. as a de facto custodian[7] in the underlying proceedings, she would not be entitled to relief on appeal.

In Indiana, we apply "the important and strong presumption that a child's interests are best served by placement with the natural parent." *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002). *See also K.I. v. J.H.*, 903 N.E.2d 453. To overcome this presumption, a third party must show by clear and convincing evidence that the child's "best interests are substantially and significantly served by placement with [the third party]." *K.I. v. J.H.*, 903 N.E.2d at 459. Even when a parent initiates an action to obtain custody of their child from a third party, the burden of proof does not shift to the parent. Rather, the burden is always on the third party. *See K.I. v. J.H.*, 903 N.E.2d 453.

---

[7] For our purposes, "de facto custodian" is defined as: "a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least…one (1) year if the child is at least three (3) years of age." Ind. Code Ann. § 31-9-2-35.5 (West, Westlaw through June 29, 2013, excluding P.L. 205-2013).

It is true that a party seeking a change in custody must persuade the trial court that "(1) modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2 and, if applicable, section 2.5 of this chapter." Indiana Code Ann. § 31–14–13–6 (West, Westlaw current through June 29, 2013, excluding P.L. 205-2013).[8] "But these are modest requirements where the party seeking to modify custody is the natural parent of a child who is in the custody of a third party." *K.I. v. J.H.*, 903 N.E.2d at 460. The first requirement is met from the outset because the parent "comes to the table with a 'strong presumption that a child's interests are best served by placement with the natural parent.'" *Id.* (quoting *In re*

---

[8] The section 2 factors are:
    (1) The age and sex of the child.
    (2) The wishes of the child's parents.
    (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
    (4) The interaction and interrelationship of the child with:
        (A) the child's parents;
        (B) the child's siblings; and
        (C) any other person who may significantly affect the child's best interest.
    (5) The child's adjustment to home, school, and community.
    (6) The mental and physical health of all individuals involved.
    (7) Evidence of a pattern of domestic or family violence by either parent.
    (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.
I.C. § 31–14–13–2 (West, Westlaw current through June 29, 2013, excluding P.L. 205-2013).
  The section 2.5 factors are:
    (1) The wishes of the child's de facto custodian.
    (2) The extent to which the child has been cared for, nurtured, and supported by the de facto custodian.
    (3) The intent of the child's parent in placing the child with the de facto custodian.
    (4) The circumstances under which the child was allowed to remain in the custody of the de facto custodian, including whether the child was placed with the de facto custodian to allow the parent seeking custody to:
        (A) seek employment;
        (B) work; or
        (C) attend school.
I.C. § 31–14–13–2.5 (West, Westlaw current through June 29, 2013, excluding P.L. 205-2013).

*Guardianship of B.H.*, 770 N.E.2d at 287).  With respect to the second factor, a substantial change in any one of the statutory factors will suffice.  For example, "[t]he interaction and interrelationship of the child with ... the child's parents," *see* I.C. § 31–14–13–2(4)(A)—one of grounds on which the trial court relied in this case—satisfies the second statutory requirement.

> In essence, although in a very technical sense, a natural parent seeking to modify custody has the burden of establishing the statutory requirements for modification by showing modification is in the child's best interest, and that there has been a substantial change in one or more of the enumerated factors, as a practical matter this is no burden at all. More precisely, the burden is minimal.

*K.I. v. J.H.*, 903 N.E.2d at 460.

In the instant case, Father clearly satisfied his minimal burden.  Therefore, the burden shifted to Grandmother to prove by clear and convincing evidence that P.A.B.'s interests were "substantially and significantly" served by placement with her.  *Id*. at 461.  If she failed to carry this burden, then "custody must be modified in favor of the child's natural parent." *Id*.

Grandmother argues that she met her burden by establishing Father abandoned P.A.B. and is unfit to provide care for the child.  The facts favorable to the judgment, however, indicate otherwise.  Although Father was not involved during much of P.A.B.'s first three years, he began actively seeking and exercising parenting time in 2009.  His parenting time increased and by the time of the final hearing in August 2012, he had successfully exercised extensive parenting time and several weekend overnights with his son.  Further, over these three years, Father stopped using drugs, stayed out of the criminal justice system, advanced in

11

his trade – securing steady income and insurance benefits, purchased a home, and maintained stability in his life. This is in stark contrast to Mother, whom Grandmother misguidedly opined at the final hearing was now capable of having custody of P.A.B.

Perhaps Father is not a model custodial parent, but the custody evaluation reveals that neither is Mother nor Grandmother. Although she has provided appropriate care for P.A.B. over the years, Grandmother has also created significant and unnecessary conflict and, for the most part, has not been supportive of Father's parenting time. In the opinion of the evaluators, Father is capable of providing good care for his son and working amicably with Mother. The record reveals that Father has bonded with P.A.B. and offers a stable and drug-free home and siblings with whom P.A.B. has a good relationship.

Grandmother failed to prove by clear and convincing evidence that P.A.B.'s interests were substantially and significantly served by continued placement with her. Accordingly, the trial court properly modified custody in favor of Father. The time has come for Father and Mother to assume responsibility over their son and for Grandmother to step back into the important but more limited role of a loving and supporting grandmother.

Judgment affirmed.

ROBB, C.J., and CRONE, J., concur.